IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

MOUNTAIN PURE LLC, JOHN STACKS
and BEVERLY STACKS                                                    PLAINTIFFS


v.                                        No. 4:02CV00100 GH


BANK OF AMERICA, N.A.                                                  DEFENDANT


## ORDER

Pending before the Court is defendant's motion for summary judgment supported by brief,
exhibits and a separate statement of undisputed facts.  Plaintiffs have filed a response, brief, exhibits
and a statement of disputed material facts.  Defendant filed a reply to which plaintiffs filed a motion
to strike or, alternatively, a response to the defendant's summary judgment amendment.  Thereafter,
defendant filed a response/reply.

Summary judgment can properly be entered when there are no genuine material facts that
can be resolved by a finder of fact; that is, there are no facts which could reasonably be resolved in
favor of either party.  The Court must determine "whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it is so one-sided that one party must prevail
as a matter of law."  Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2512 (1986).  The non-
moving party may not just rest upon his or her pleadings, but must set forth specific facts showing
that there is a genuine issue for trial.  Celotex Corp. v. Catrett, 106 S.Ct. 2548 (1986); Civil
Procedure Rule 56.  "The mere existence of a factual dispute is insufficient alone to bar summary

judgment; rather the dispute must be outcome determinative under prevailing law." Holloway v. Pigman, 884 F.2d 365, 366 (8th Cir. 1989).

Local Rule 56.1 provides that a party moving for summary judgment must file a separate, short and concise statement of material facts as to which it contends there is no genuine issue to be tried.  The rule further provides that unless the non-moving party files a separate, short and concise statement of the material facts as to which it contends a genuine issue exists to be tried, all material facts set forth in the moving party's statement will be deemed admitted.

Defendant's Local Rule 56.1 statement is set out below with plaintiffs' Local Rule 56.1 response[1] in brackets:

1.      Under the terms of a Promissory Note dated September 21, 1999, Bank of America extended a line of credit to John and Beverly Stacks ("the Stacks") in the amount of $650,000.00 (the "Line of Credit').  [Agree.]

2.      The Line of Credit was secured by the Stacks with a pledge of Union Planters Bank stock (the "Stock") as collateral.  [Agree.]

3.      Bank of America requested the Stacks to move the Line of Credit to another lender, and the Line of Credit was subsequently paid off by a new lender procured by the Stacks.  [Agree.]

4.      Bank of America released the Stock to the new lender in exchange for a release and indemnification from the new lender.  [Plaintiffs agree that Bank of America released the

---

[1]Although defendant argues that the Court should not consider plaintiffs' Local Rule 56.1 statement since it was filed 28 days after their response was filed and was after defendant had asked the Court to deem the facts in its Local Rule 56.1 statement admitted, the Court is persuaded that defendant is not prejudiced by the late filing.

stock to the Stacks' new lender but assert that the bank delayed approximately two months in doing so.]

5.   Plaintiffs' original complaint contained allegations against Bank of America relating to both the Line of Credit and a separate loan to Mountain Pure and guaranteed by the Stacks (the "Term Loan').  The allegations relating to the Term Loan were sent to arbitration.  [Agree.]

6.   The arbitrator dismissed the arbitration with prejudice due in part to plaintiffs' improbable success on the merits.  [Agree.]

7.   Only plaintiffs' allegations as to the Line of Credit remain pending.  [Agree.]

8.   Plaintiffs seek recovery in this lawsuit regarding the Line of Credit for the same damages it claimed in the arbitration regarding the Term Loan.  [Plaintiffs deny defendant's statement of undisputed fact No. 8.  While it is true that plaintiffs seek recovery of some of the same damages in this case which were sought in arbitration, plaintiffs also seek damages in this case for fees and costs which John Stacks was required to pay in defense of a lawsuit against him which would not have occurred if the bank had timely released the stock it held as collateral, and plaintiffs seek damages in this case for lost profits suffered as a result of the delay in purchasing a blow mold machine caused by the delay in releasing the stock. Finally, plaintiffs seek damages in this lawsuit for attorney's fees which plaintiff had to pay attorney Tom Vaughan for his attempts to procure the release of the stock from the defendant.  None of these items of damages were asserted in the arbitration.]

9.   The plaintiffs claim they sold assets at less than fair marker value as a result of Bank of America's actions with regard to the Line of Credit and the Term Loan but plaintiffs are unable to state without speculation what damages, if any, they incurred as a result of Bank

of America's actions with regard to the pending lawsuit involving the Line of Credit. [Plaintiffs deny defendant's statement of undisputed fact No. 9.  While plaintiffs concede that they cannot apportion damages between the claim with regard to the line of credit and the claim with regard to the term loan, plaintiffs can state with certainty, and have done so, that they sustained damages and can state with certainty the amount of those damages. Plaintiffs contend that, under the law, they are not required to apportion damages if two or more events cause an indivisible harm.]

10.    The plaintiffs claim Mountain Pure suffered damages relating to the purchase of bottling equipment as a result of Bank of America's actions with regard to the Line of Credit and the Term Loan but plaintiffs are unable to identify, without speculation, what damages, if any, Mountain Pure incurred as a result of Bank of America's actions with regard to the Line of Credit.  [Plaintiffs deny defendant's statement of undisputed facts No. 10.  Plaintiffs have positively identified damages suffered by Mountain Pure and by John Stacks relating to the loss of a discount on the purchase of a blow mold machine for Mountain Pure's use, and lost profits which Mountain Pure incurred as a result of the delay in purchasing the blow mold machine.]

11.    The plaintiffs claim the Stacks sold an apartment complex to their detriment as a result of Bank of America's actions with regard to the Line of Credit and the Term Loan but the apartment complex was not owned by any of the three plaintiffs.[2]

---

[2]While plaintiffs denied Nos. 11 and 12, claiming that John Stacks owned the apartment complex, in their response, plaintiffs concede that they did not own the apartment complex, that they cannot assert damages on behalf of Dairy Senter, Inc., and that defendant is entitled to summary judgment regarding the apartment complex.  No explanation is given as to why plaintiffs gave these responses to Nos. 11 and 12 which are clearly opposite to the controlling

12.     The apartment complex in question was owned, at the time of its sale, by Dairy Senter, Inc., an Arkansas corporation, which is not a party to this case.

13.     Mountain Pure is an Arkansas limited liability company.  [Admit.]

14.     Mountain Pure was not a party to the Promissory Note memorializing the Line of Credit at issue in this case.  [Admit.]

15.     Mountain Pure is not mentioned, either specifically or as a member of a designated class, in the Promissary Note memorializing the Line of Credit at issue in this case.  [Admit.]

Plaintiffs add that they contend and will show that Mountain Pure is a sub-chapter S corporation, that all profits and losses of Mountain Pure flow directly to John Stacks, that John Stacks personally pays income taxes on profits of Mountain Pure and takes losses of Mountain Pure on his income tax returns, and that Mountain Pure pays no corporate income taxes.  Plaintiff contend that Mountain Pure should be treated under the law as a sole proprietorship.

Defendant argues that plaintiffs' claim for damages caused by its actions regarding the Line of Credit is supported only by speculation and they are unable to distinguish their damages relating to the Line of Credit from those relating to the Term Loan which were the subject of the arbitration. Defendant points to the testimony in the depositions of John Stacks that it would be speculating and guessing to distinguish or separate the damages from calling the note on the Term Loan and closing the Line of Credit and the deposition of Beverly Stacks where she admitted that she did not know what caused the claimed damages.  It continues that res judicata bars relitigation of claims decided in the arbitration proceedings and that Mountain Pure, a limited liability company, was not a party to the Line of Credit and so cannot assert any damages for the alleged breach of contract.

---

concession in the response itself.

Plaintiffs respond that John directly testified that his damages were caused by the bank's refusal to release the bank stock and that John was simply unable to apportion the damages between the two events which both caused the same harm instead of not being able to prove damages with reasonable certainty. They state that John testified that he was prevented from obtaining a $50,000 discount on a blow mold was solely attributable to the failure to release the stock; that as a result of his inability to obtain money from JB Hunt due to the failure to release the stock he was unable to pay a bill to a grocery supplier which resulted in a lawsuit being filed against him and was required to pay that plaintiff's attorney's fees and costs; that he never testified that the refusal to release the collateral did not cause his damages; and that he did not testify that he would be required to speculate regarding the amount of damages. Plaintiffs assert that the inability to apportion damages between two events which causes indivisible harm is not a bar to recovery even in contract cases. They continue that res judicata is inapplicable as defendant did not raise that affirmative defense in its answer, defendant waived the defense by acquiescence in the maintenance of two separate suits, this Court expressly provided that this claim would continue after the arbitration was resolved, and plaintiffs' damages claim was not submitted, much less decided, in the arbitration. Plaintiffs argue that John can recover damages related to the purchase of the blow mold machine since John drew money from his personal line of credit to purchase the blow mold machine and so could have saved $50,000 and that with Mountain Pure being a sub-chapter S corporation, John takes all the corporate profits and losses personally and is treated as a sole proprietor so any loss Mountain Pure sustained is a personal loss to John.

In its reply, defendant states that plaintiffs, when they filed their response, also provided documents which it had sought in discovery which it asserts challenges John's veracity. Defendant

counters that the doctrine of indivisible harm is a tort doctrine that has no application to a contract case, the actions regarding the Term Loan and the Line of Credit were two distinct actions taken at separate times and involving different contracts and since the claims concerning the Term Loan were dismissed with prejudice in the arbitration proceeding, there is now only one claimed breach of contract – not two breaches – that caused an indivisible harm.  It asserts that Mountain Pure's claimed status as a sub-chapter S corporation is irrelevant as a S corporation must still pursue redress for damages by the corporation and not by the shareholder and the case relied upon plaintiffs involved an equitable ruling to not permit a parent to avoid child support obligations by hiding behind S corporation tax status.

Defendant contends that the recently received documents demonstrate that plaintiffs suffered no damages from the refusal to release the Stock pledged as collateral on the Line of Credit as Hunt wired $655,849.92 on February 14, 2002 to cover the payoff of the Line of Credit and that same date wired John the remainder of the $900,000 borrowing limit of $244,150.08 to the Stacks' personal account so that by February 14th, John had full access to all of the funds that the Loan Agreement with Hunt called for him to have until he provided "evidence satisfactory to Lender that the Uniloy Millacron [sic] 3-position blow mold machine has been purchased by Borrower;" the contract for the purchase of that equipment was not executed by Mountain Pure until March 1, 2002 and was not accepted by Uniloy until March 20th; John did not provide Hunt with any evidence that the machine had been purchased until April 12th; and that two days later on April 14th, Hunt disbursed the remaining $200,000 of the Hunt loan.  It states that those facts confirm that the sale of assets and the alleged payment of attorney's fees and costs were not caused by any delay of defendant releasing the Stock to Hunt since John had all the cash from Hunt that he was going to get until he provided

evidence that Mountain Pure had purchased the blow mold machine and that any delay in the purchase of the machine was due to the conduct of Mountain Pure and Uniloy Milacron. Defendant states that plaintiffs' own documents demonstrate that the refusal to release the Stock had no effect on plaintiffs' ability to obtain capital because funds were disbursed under the Hunt loan agreement precisely as that document scheduled the disbursements and without any delay. It continues that the contract between Mountain Pure and Uniloy Milacron reflects that Uniloy offered Mountain Pure a discount of $67,900 so long as the contract was accepted by Mountain Pure within 10 days of the date of the quote which Mountain Pure signed the quotation and Mountain Pure's accounts payable sheet for Uniloy shows that Mountain Pure paid only $496,424.89 thereby receiving a $70,475.11 discount which was more than the quoted and discounted price. Defendant argues that the documents show that there was no delay in consummating the contract as Mountain Pure made its offer to purchase within the period set by the Uniloy quotation and Mountain Pure disbursed a $200,000 down payment to Uniloy on February 28th and that the machine was produced and delivered on the schedule specified in the contract so plaintiffs suffered no delays in receiving the machine. It relies on the affidavit by Ken Sanders, the collector for Convenience Store Supply, Inc., that Stacks only paid what was owed on the open account plus interest that accrued from the date of suit to the date of payment and so did not pay for Convenience Store's attorney's fees or costs as reflected in the accounts sheets and statements attached to the affidavit.

Plaintiffs challenge defendant attaching new evidentiary materials with its reply. They then start that they were required under the agreement with Hunt to pay Hunt's attorney's fees incurred in attempting to obtain a release of the stock which would not have been necessary had defendant released the stock as it had promised. Plaintiffs continue that while Hunt wired approximately

$655,000 to defendant to pay off the line of credit and did wire John approximately $245,000 with another $200,000 to be paid when plaintiffs provided evidence that the blow mold machine had been purchased, Hunt refused to release the additional $200,000 until defendant released the stock it was holding as collateral so submitting evidence of the machine purchase would have been futile and the collateral was not released until approximately April 11th or 12th which delayed receipt of the $200,000 which plaintiffs could have used for any purpose as the Hunt contract only required evidence of purchase – not that it be spent – so that plaintiffs had to sell other assets. While acknowledging that they did receive a discount on the blow mold machine, they contend that they would have received a larger discount if they had placed the order in mid February as John had negotiated a discount, over and above the discount actually given, for the purchase of three machines which required the purchase order to be placed by mid February. Plaintiffs state that they were unable to place the order for the machine in mid February and that John's testimony contradicts Sanders' affidavit.

Defendant, in the last filing regarding summary judgment, contests what it contends as the attempt to evade summary judgment by submitting an additional affidavit from John that contradicts his earlier deposition testimony and pleadings. It again sets out that all funds from the Hunt loan were disbursed precisely according to the schedule established in the agreement and that John's affidavit is not supported by the documents and that Thomas Vaughan's response as to why Hunt had not made the final disbursement was that Vaughan did not know. Defendant continues that John's most recent affidavit contradicts his other statements regarding the purchase of the blow mold machine since every mention before in both pleadings and John's depositions and prior affidavit was to a singular machine as illustrated by "a piece of equipment," "the machine," and "that machine"

and that he cannot – through this latest affidavit – create a fact question in direct contradiction to the complaint, his two-month old prior deposition, and one-month old affidavit.  As to the issue of attorney's fees incurred in the Hunt loan, defendant states that such damages would be special damages which defendant did not agree, expressly or tacitly, to assume responsibility from the alleged breach since plaintiffs have presented no evidence that defendant knew that such damages would result from a breach of the contract and defendant did not agree to assume responsibility for such damages which could not have been known when it extended credit that plaintiffs would undertake in securing credit from another lender.

Plaintiffs motion to strike the defendant's reply is denied.  Defendant has explained that the documents it was relying on had just been received from plaintiffs, the Court has permitted plaintiffs to file a belated Rule 56.1 statement, and plaintiffs have had a chance to address defendant's new submissions.

Recently, the Eighth Circuit Court of Appeals addressed the sham affidavit argument in City of St. Joseph, Mo. v. Southwestern Bell Telephone, 439 F.3d 468, 475-476 (8th Cir. 2006), as follows:

> In Camfield, we addressed "the troublesome issue of whether summary judgment may be granted when one of the parties after giving a deposition later files an affidavit with directly contrary statements." Id. In affirming the district court's grant of summary judgment for the defendant, this court held that an affidavit filed by the plaintiff in opposition to a motion for summary judgment that directly contradicted the plaintiff's previous deposition testimony was insufficient to create a genuine issue of material fact under Rule 56.  Id. at 1365.  We stated:
>
> > The very purpose of summary judgment under Rule 56 is to prevent "the assertion of unfounded claims or the interposition of specious denials or sham defenses .... " 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2712 (1983).  If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the

utility of summary judgment as a procedure for screening out sham issues of fact.

Id.  We emphasized that while summary judgment "is to be reserved for those cases in which there is no genuine material issue of fact for determination," if "testimony under oath ... can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment."  Id.  No party should be allowed to create "issues of credibility" by contradicting his own previous testimony.  Id. at 1366.

District courts, however, must use extreme care in examining such issues and only grant summary judgment where "the conflicts between the deposition and affidavit raise only sham issues."  Id.  Accordingly, when the affiant states in his affidavit that he was confused in his deposition or where the affiant needs to explain portions of his deposition testimony that were unclear, the district court should not strike the affidavit from the record.  Id. at 1364-65. In addition, when the affiant's affidavit does not actually contradict his earlier testimony, the district court should not strike the affidavit from the record.  Bass v. City of Sioux Falls, 232 F.3d 615, 618 (8th Cir. 1999).

Here, the district court "articulat[ed] with care its reasons" for finding that Sparks's affidavit contradicted his prior deposition testimony.  Camfield, 719 F.2d at 1366.  First, while Sparks testified in his deposition that Hansen told him that SWBT "might be" started with the relocation by July 1, 2000, he stated in his affidavit that Hansen told him that SWBT would "start work before the end of June 2000 so as to not interfere with the Contractor's work," which was to commence on July 5, 2000.  The two statements are inconsistent because Hansen could not say that SWBT might start the relocation by July 1, 2000, and simultaneously commit SWBT to definitively starting the relocation before June 30, 2000.

Second, Sparks's claim in his affidavit that Hansen told him that SWBT was "committed to working ahead of the City's contractor" conflicts with his e-mail to Cocoran in which he wrote that he "never could figure out how they were going to relocate before the contractor completed the cuts and fills anyway."  In addition, Sparks testified in his deposition that the "slight predicament" the City was in was "a contractor wanting to start about the same time that Bell is going to be there," meaning they would have to "work around each other." Therefore, Sparks's e-mail and deposition testimony reveal Sparks's understanding, as of May 25, 2000, that SWBT would not be working ahead of the City's contractor.

Third, Sparks never claimed in his affidavit that he was confused in his deposition or that he needed to clarify statements he made in his deposition.

Finally, we agree with the district court that the City's filing of Sparks's affidavit on the same day that the City's Suggestions in Opposition to Defendant's Motion for Summary Judgment were due is highly suspicious.   The timing of the affidavit, combined with the aforementioned factors, indicate that the City engaged in a last-minute effort to create a genuine issue of material fact to prevent the district court's entry of summary judgment in

SWBT's favor.  Therefore, we hold that the district court was entitled to "grant summary judgment where [the City's] sudden and unexplained revision of testimony create[d] an issue of fact where none existed before."  Wilson v. Westinghouse Elec. Corp., 838 F.2d 286, 288 (8th Cir. 1988).

The Court has carefully scrutinized the parties' arguments in light of the exhibits.  After reviewing the $1,100,000 loan agreement between the Stacks and Hunt and the purchase agreement for the blow mold machine between Mountain Pure and Uniloy Milacron, the Court must agree with defendant that plaintiffs did not suffer damages regarding the release of the stock with the Line of Credit.  Defendant has correctly described what the Hunt loan agreement and loan summary and the Uniloy agreement and invoice documents reflect.  The February 14th Hunt loan agreement provided that the approximately $650,000 be paid to defendant and the difference between that balance and the initial borrowing limit be disbursed to the Stacks account with the remaining balance available – $200,000 – "may be advanced upon Borrower providing evidence satisfactory to Lender that the Uniloy Millacron [sic] 3-position blow mold machine has been purchased by Borrower."  On February 14th, Hunt wired the $655,849.92 to cover the payoff of the Line of Credit and also wired Stacks $244,150.08.  The documents further establish that the contract for the purchase of the blow mold machine was executed by Mountain Pure on March 1st and was accepted by Uniloy on March 20th, Stacks provided evidence of the blow machine purchase to Hunt on April 12th and Hunt disbursed the remaining $200,000 as set out in the loan agreement on April 14th.  As defendant points out, plaintiffs did not dispute what the documents reflect – they only argued that John in another affidavit stated that he thought it would be futile to submit the proof of the blow machine purchase to Hunt.  In addition, defendant is correct that Vaughan's deposition testimony was that he did not know why John had not asked for the final disbursement.

The Court also agrees with defendant that John's May 3rd affidavit is contradictory to the facts alleged in the complaint, the facts argued by plaintiffs up until the May 3rd pleading, John's prior depositions and affidavit, and all the documents that have been submitted.  Everything reflects that there was just one blow mold machine at issue for which a discount was received – not three as asserted in the latest John affidavit – and plaintiffs have not submitted any documents that support the affidavit's assertions nor have they tried to explain the discrepancy between their prior position and the latest affidavit.  The Court also notes the timing of the May 3rd affidavit following the submission by defendant of the documents that set out the timing of the loan disbursements, the machine purchase and the submission of the purchase proof to Hunt.  Thus, the Court finds that John's May 3rd contradictory affidavit is insufficient to create a genuine issue of material fact.

Accordingly, defendant's motion (#16) for summary judgment is hereby granted.  Plaintiffs' motion (#27) to strike is denied.  In light of the grant of summary judgment, defendant's motion (#29) in limine has been rendered moot.

IT IS SO ORDERED this 28th day of March, 2006.

_George Howard, Jr_
UNITED STATES DISTRICT JUDGE